Opinion issued December 5, 2003







 









In The
Court of Appeals
For The
First District of Texas
 

 
 
NO. 01-01-00608-CV
____________
 
 
ATLANTIC LLOYDS INSURANCE COMPANY OF TEXAS,
CENTENNIAL INSURANCE COMPANY, ATLANTIC MUTUAL
INSURANCE COMPANY, BARRY BRADY, AND THOMAS GERVASIO,
Appellants
 
V.
 
SUE BUTLER, SHEILA CAULEY, BRAD GODWIN, GAYLE GODWIN,
INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE
ESTATE OF PAUL GODWIN, DECEASED, DELORES HARDY,
MARILYN SAVAGE MARTINEZ, AS PERSONAL REPRESENTATIVE
OF THE ESTATE OF HELEN JANICE SAVAGE, DECEASED, THOMAS
J. MAY, DEAN PICKRELL, NICOLA PICKRELL, INDIVIDUALLY AND
AS NEXT FRIEND OF DANIEL PICKRELL, ISAAC PINEDA, ALTA
SELF, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF
THE ESTATE OF CLIFTON SELF, DECEASED, MARY THOMAS,
DIANNE THOMPSON, OLLIE MAE WASHINGTON, DAVID SCHNAKE,
MELVIN THORNTON, WILLIE STAFFORD, AND DAVID PRINCE,
Appellees
 
* * * * *
 
SUE BUTLER, SHEILA CAULEY, BRAD GODWIN, GAYLE GODWIN,
INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE
ESTATE OF PAUL GODWIN, DECEASED, DELORES HARDY,
MARILYN SAVAGE MARTINEZ, AS PERSONAL REPRESENTATIVE
OF THE ESTATE OF HELEN JANICE SAVAGE, DECEASED, THOMAS
J. MAY, DEAN PICKRELL, NICOLA PICKRELL, INDIVIDUALLY AND
AS NEXT FRIEND OF DANIEL PICKRELL, ISAAC PINEDA, ALTA
SELF, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF
THE ESTATE OF CLIFTON SELF, DECEASED, MARY THOMAS,
DIANNE THOMPSON, OLLIE MAE WASHINGTON, DAVID SCHNAKE,
AND MELVIN THORNTON, Appellants
 
V.
 
ATLANTIC LLOYDS INSURANCE COMPANY OF TEXAS,
CENTENNIAL INSURANCE COMPANY, ATLANTIC MUTUAL
INSURANCE COMPANY, BARRY BRADY, THOMAS GERVASIO, AND
H.R. MANAGEMENT COMPANY, Appellees
 
* * * * *
 
H.R. MANAGEMENT COMPANY, Appellant 
 
V.
 
SUE BUTLER, SHEILA CAULEY, BRAD GODWIN, GAYLE GODWIN,
INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE
ESTATE OF PAUL GODWIN, DECEASED, DELORES HARDY,
MARILYN SAVAGE MARTINEZ, AS PERSONAL REPRESENTATIVE
OF THE ESTATE OF HELEN JANICE SAVAGE, DECEASED, THOMAS
J. MAY, DEAN PICKRELL, NICOLA PICKRELL, INDIVIDUALLY AND
AS NEXT FRIEND OF DANIEL PICKRELL, ISAAC PINEDA, ALTA
SELF, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF
THE ESTATE OF CLIFTON SELF, DECEASED, MARY THOMAS,
DIANNE THOMPSON, OLLIE MAE WASHINGTON, DAVID SCHNAKE,
MELVIN THORNTON, AND ZURICH INSURANCE COMPANY, Appellees
 
 

 
 
On Appeal from the 269th District Court
Harris County, Texas
Trial Court Cause No. 96-50493
 

 
 
O P I N I O N
          These appeals arise from the trial court’s rulings on multiple motions for
summary judgment, which disposed of all of the parties’ claims, counterclaims, and
third-party claims made in connection with a 1993 settlement agreement in a toxic-tort lawsuit.
          The plaintiffs below, Sue Butler, Sheila Cauley, Brad Godwin, Gayle Godwin,
individually and as personal representative of the estate of Paul Godwin, deceased,
Delores Hardy, Marilyn Savage Martinez, as personal representative of the estate of
Helen Janice Savage, deceased, Thomas J. May, Dean Pickrell, Nicola Pickrell,
individually and as next friend of Daniel Pickrell, Isaac Pineda, Alta Self,
individually and as personal representative of the estate of Clifton Self, deceased,
Mary Thomas, Dianne Thompson, Ollie Mae Washington, David Schnake, and
Melvin Thornton (collectively, “the plaintiffs”), challenge the trial court’s rendition
of summary judgment on their claims in favor of the defendants below, Atlantic
Lloyds Insurance Company of Texas (Atlantic Lloyds), Centennial Insurance
Company (Centennial), Atlantic Mutual Insurance Company (Atlantic Mutual), H.R.
Management Company (HRM), Barry Brady, and Thomas Gervasio (collectively,
“the defendants”). The plaintiffs also challenge the trial court’s denial of their motion
for summary judgment on their claim for breach of the 1993 settlement agreement.
          In five issues, the plaintiffs contend that the trial court erred in granting
summary judgment for the defendants on the plaintiffs’ claims for breach of the 1993
settlement agreement, fraudulent inducement, conspiracy to defraud, negligent
misrepresentation, promissory estoppel, quantum meruit, breach of insurance
contracts, breach of the duty of good faith and fair dealing, and violations of the
Texas Insurance Code


; in granting summary judgment as to motions that had not
been properly set or heard; and in ruling that certain documents previously produced
in discovery were privileged.



          Defendants Atlantic Lloyds and Centennial contend, in two issues, that the trial
court erred in granting summary judgment for the plaintiffs on the defendant’s 
counterclaims for fraud, conspiracy to defraud, and unjust enrichment brought against
the plaintiffs and their former attorney, David Prince.
          We affirm.
Factual and Procedural Background



          In 1987, the Texas Department of Agriculture (TDA), pursuant to an
investigation, determined that maintenance workers had used chlordane


 in 1986 and
1987 at the Fondren Green apartment complex in Houston. Westwood Savings and
Loan Association (Westwood) owned the complex, and HRM managed the complex
until January 1, 1987, when RFG Management (“RFG”) took over management.
          Beginning in 1988, several former residents and employees of the complex
filed lawsuits against several defendants, asserting personal injury and related claims
based on their exposure to the chemical. These suits were ultimately consolidated in
federal district court (“the underlying lawsuit”).


 Westwood, HRM and RFG were
among the defendants in the underlying lawsuit.
          Westwood held an insurance policy from Zurich Insurance Company (Zurich),
which provided coverage to any person or organization that managed Westwood’s
property. In settlement of the claims presented against Westwood and RFG, Zurich
tendered the $1 million limits of its policy to the plaintiffs. Zurich then withdrew
from defending HRM.
          HRM held three insurance policies: (1) a $300,000 primary coverage policy
issued by Atlantic Lloyds; (2) a $15 million umbrella policy issued by Centennial,
which expired on September 10, 1986; and (3) a $10 million umbrella policy issued
by Centennial under which coverage began following the expiration of the $15
million policy. Atlantic Mutual owns Centennial and is the parent company and
general managing agent for both Centennial and Atlantic Lloyds. Barry Brady was
a claims handler for Atlantic Mutual who was assigned to the underlying litigation,
and Thomas Gervasio was Brady’s supervisor.
          In 1993, following lengthy settlement negotiations and two mediations, the
plaintiffs, represented at that time by attorneys David Prince and John O’Quinn,
settled their claims against HRM in the underlying lawsuit. It is undisputed that
insurance coverage was an important issue for the plaintiffs. Atlantic Lloyds and
Centennial contended that the $15 million policy did not apply to the plaintiff’s
claims. Nevertheless, there was no coverage question as to the $300,000 policy and
the $10 million policy. As part of the settlement, HRM, through its insurers, initially
paid approximately $530,000 to settle the claims of Daniel Pickrell, a minor. After
further negotiations with O’Quinn and Prince, HRM paid $9,759,562 to settle the
remaining plaintiffs’ claims and received releases from all of the plaintiffs.
          Also in 1993, and following the settlement of the underlying lawsuit, HRM
sued Zurich in federal district court for alleged wrongful settlement practices. HRM 
asserted that it was an additional insured under the Zurich policy and that Zurich had
wrongfully exhausted the limits of the policy without settling any of the claims
brought against HRM. The federal district court granted summary judgment in favor
of Zurich on HRM’s claims, and the court of appeals affirmed the judgment.



          The plaintiffs filed the instant suit


 against the defendants in 1996, asserting
that the defendants breached the 1993 settlement agreement and fraudulently induced
the plaintiffs into settling their claims by misrepresenting the amount of insurance
available for settlement. Specifically, the plaintiffs alleged that the agreement with
HRM was reached in accord with the plaintiffs’ demand to settle their claims for the
full amount of the remaining policy limits of all policies covering HRM for which
coverage had not been denied. The plaintiffs alleged that the attorneys for HRM
falsely represented to O’Quinn and Prince that only $10.3 million in coverage was
available for settlement because coverage under HRM’s $15 million policy had been
denied. The plaintiffs contended, in part, that coverage under the $15 million policy
was not formally denied and that the settlement check delivered to them was drafted
against the $15 million policy.



          Atlantic Lloyds and Centennial filed counterclaims against the plaintiffs and
Prince, asserting that the underlying lawsuit was a fraudulent scheme engineered by
Prince and others to defraud HRM and its insurers and that the plaintiffs had
exaggerated or falsely represented their injuries and damages. These counterclaims
were based, in part, on a 1995 sworn statement given by a former employee of the
Fondren Green apartment complex, Willie Stafford, who admitted that he had sprayed
chlordane in some of the units at the complex. In his 1995 statement, Stafford
testified that he was provided money and cocaine to help recruit additional plaintiffs
for the underlying lawsuit and that he was paid by Prince to exaggerate his testimony
concerning the number of apartments that he had actually sprayed with chlordane.


 
Atlantic Lloyds and Centennial also produced testimony from other witnesses
allegedly corroborating the allegations made by Stafford.
          The parties filed multiple summary judgment motions on numerous issues, and,
after several oral hearings, the trial court granted summary judgment in favor of the
defendants on all of the plaintiffs’ claims and summary judgment for the plaintiffs on
the counterclaims asserted by Atlantic Lloyds and Centennial. The trial court entered
a “global” final judgment on July 11, 2001.
Standard of Review
          A party moving for summary judgment has the burden of proving that there is
no genuine issue of material fact and that the movant is entitled to judgment as a
matter of law. Tex. R. Civ. P. 166a(c); Nixon v. Mr. Prop. Mgmt., 690 S.W.2d 546,
548 (Tex. 1985); Farah v. Mafrige & Kormanik, 927 S.W.2d 663, 670 (Tex.
App.—Houston [1st Dist.] 1996, no writ). When deciding whether there is a
disputed, material fact issue precluding summary judgment, evidence favorable to the
non-movant will be taken as true. Nixon, 690 S.W.2d. at 548-49. Every reasonable
inference must be indulged in favor of the non-movant and any doubts resolved in its
favor. Id. at 549. When a defendant moves for summary judgment, it must either (1)
disprove at least one element of the plaintiff’s cause of action or (2) plead and
conclusively establish each essential element of its affirmative defense, thereby
defeating the plaintiff’s cause of action. Cathey v. Booth, 900 S.W.2d 339, 341 (Tex.
1995); Farah, 927 S.W.2d at 670.
          Here, none of the pertinent summary judgment orders specifies the grounds
upon which the trial court relied. Therefore, on appeal, a non-movant is required to
show that each summary judgment ground alleged was insufficient to support
summary judgment. Star-Telegram, Inc. v. Doe, 915 S.W.2d 471, 473 (Tex. 1995).
Accordingly, we will affirm any summary judgment order if any of the grounds
presented in the supporting motion is meritorious. Harwell v. State Farm Mut. Auto.
Ins. Co., 896 S.W.2d 170, 173 (Tex. 1995); Carr v. Brasher, 776 S.W.2d 567, 569
(Tex. 1989).
          When, as here, both parties move for summary judgment, the appealing party
may challenge the denial of its own motion, as well as the judgment in favor of the
prevailing party. CU Lloyd’s v. Feldman, 977 S.W.2d 568, 569 (Tex. 1998). Each
party must carry its own burden, however, both as movant and, in response to the
other party’s motion, as non-movant. Id.; James v. Hitchcock Indep. Sch. Dist., 742
S.W.2d 701, 703 (Tex. App.—Houston [1st Dist.] 1987, writ denied).
                                               The Plaintiffs’ Appeal
Breach of the 1993 Settlement Agreement
          In their first issue, the plaintiffs contend that the trial court erred in granting
summary judgment against them, instead of in their favor, on their claim that the
defendants breached the 1993 settlement agreement. They argue that the trial court’s
procedures were “fatally flawed”; that Atlantic Lloyds, Centennial and HRM
breached the 1993 settlement agreement as a matter of law; and that, alternatively, the
summary judgment evidence established an issue of material fact as to whether the
agreement was for “policy limits or a sum certain.”
          Procedural Issue
          In an initial procedural issue, the plaintiffs argue that, “without notice or
hearing,” the trial court improperly granted summary judgment for the defendants on
the plaintiffs’ claim for breach of the 1993 settlement agreement. See Tex. R. Civ.
P. 166a(c).
          In May 1999, the defendants filed a summary judgment motion on the
plaintiffs’ claim for breach of the agreement, and the plaintiffs filed their response in
January 2000. A court master, appointed to rule on pre-trial matters, initially denied
the defendants’ motion in March 2000. Subsequently, the trial court, at the outset of
a hearing that it conducted on August 18, 2000, stated that it had considered the
issues presented in the defendant’s motion, the plaintiffs’ response, and the summary
judgment record. The trial court then, on the record, pronounced its ruling that, as a
matter of law, the 1993 settlement agreement was for a “sum specific,” $9,759,362,
and not for “policy limits.” The plaintiffs’ counsel then presented argument and
authorities to the court in support of their position and in opposition to the
defendants’ motion. Following its ruling, the trial court asked the parties, “Am I clear
on that? Okay. So that’s my ruling here this afternoon on that issue.” On October
27, 2000, the trial court signed its order granting the defendants’ motion and denying
the plaintiffs’ motion on the plaintiffs’ claim for breach of the agreement.
          The record indicates that, at the hearing, the plaintiffs’ counsel made no
objection regarding a lack of adequate notice and did not raise such objection at any
time thereafter. Accordingly, we hold that any such error was waived. See Tex. R.
App. P. 33.1; White v. Wah, 789 S.W.2d 312, 319 (Tex. App.—Houston [1st Dist.]
1990, no writ).
          The plaintiffs also argue that the result of the trial court’s July 11, 2001
“global” final judgment was, in effect, to grant the plaintiffs’ own motion for
summary judgment in favor of their claim against the defendants for breach of the
terms of the 1993 settlement agreement. We disagree. Such an implied ruling is
contrary to the trial court’s oral pronouncements from the bench at the August 2000
hearing and to its written October 27, 2000 ruling granting the defendants’ motion
and denying the plaintiffs’ motion. Moreover, in its final judgment, the trial court
granted only “all outstanding motions for summary judgment.” As a result of the trial
court’s earlier ruling denying the plaintiffs’ motion for summary judgment for breach
of the settlement agreement, the plaintiffs’ motion was no longer an “outstanding”
motion and thus could not have been granted by the trial court’s final judgment.
          Terms of the 1993 Settlement Agreement
          One of the grounds asserted in the defendants’ summary judgment motion as
to the plaintiff’s breach-of-contract claim was that, as a matter of law, the terms of the
1993 settlement agreement specified a sum certain, $9,759,362, representing the
remaining available limits of the $10 million policy, and that the agreement did not
encompass the limits of the $15 million policy.
          In contrast, the plaintiffs responded, and contend on appeal, that the summary
judgment evidence established, as a matter of law, that they had an oral agreement
with the defendants to settle all claims against HRM for all available, unexhausted
policy limits or, alternatively, that the summary judgment evidence raised a material
fact question on this issue.
          The law in regard to contract interpretation is clear and well-settled. The
interpretation of an unambiguous contract is a question of law, which is reviewed de
novo. MCI Telecomms. Corp. v. Tex. Utils. Elec. Co., 995 S.W.2d 647, 650-51 (Tex.
1999). Whether a contract is ambiguous is also a question of law. See Columbia Gas
Transmission Corp. v. New Ulm Gas, Ltd., 940 S.W.2d 587, 589 (Tex. 1996). To
determine whether a contract is ambiguous, we look at the agreement as a whole in
light of the circumstances present when the parties entered into the contract. Nat’l
Union Fire Ins. Co. v. CBI Indus., Inc., 907 S.W.2d 517, 520 (Tex. 1995). We
examine and consider the entire writing in an effort to harmonize and to give effect
to all the provisions of the contract so that none will be rendered meaningless. Id. 
No single provision will control; rather, all provisions must be considered with
reference to the whole instrument. Id.
          Our primary concern in construing a written contract is to ascertain the true
intent of the parties as expressed in the instrument. Forbau v. Aetna Life Ins. Co.,
876 S.W.2d 132, 133 (Tex. 1994). If a written contract is worded in such a way that
it can be given a definite or certain legal meaning, then the contract is not ambiguous. 
CBI Indus., 907 S.W.2d at 520. A contract will become ambiguous only if its
meaning is uncertain or if it is subject to two or more reasonable interpretations. Id. 
An ambiguity does not arise simply because the parties advance conflicting
interpretations of the contract. Forbau, 876 S.W.2d at 134.
          Moreover, we may not consider extrinsic evidence to contradict or to vary the
meaning of unambiguous language in a written contract in order to create an
ambiguity. Sears, Roebuck & Co. v. Commercial Union Ins. Corp., 982 S.W.2d 151,
154 (Tex. App.—Houston [1st Dist.] 1998, no pet.). A court may consider the
parties’ interpretations of the contract through extrinsic or parol evidence only after
a contract is first determined to be ambiguous. See Friendswood Dev. Co. v. McDade
+ Co., 926 S.W.2d 280, 283 (Tex. 1996). An “ambiguity must become evident when
the contract is read in context of the surrounding circumstances, not after parol
evidence of intent is admitted to create an ambiguity.” CBI Indus., 907 S.W.2d at
521.
          In support of their argument, the plaintiffs direct us to deposition and affidavit
testimony of O’Quinn and Prince that they reached an oral agreement with HRM’s
attorneys to settle the plaintiffs’ claims for “all available policy limits.” The plaintiffs
also point to a January 6, 1993 settlement demand letter sent from O’Quinn to
Thomas Alleman, an attorney who represented HRM in the underlying lawsuit. 
O’Quinn’s letter reads as follows:
As a result of your conversation with Mr. Prince about settling
this case, Mr. Prince and I have met and reached a decision.
 
From his conversation with you, Mr. Prince was led to believe
that the insurance carrier which had the coverage for your client up to
September 10, 1986 in the amount of $15,000,000 has denied coverage. 
Mr. Prince was further led to believe that, therefore, the only available
coverage to pay our clients at this time would be the insurance after
September 1986, in the amount of $10,300,000 less the $500,000 paid
to Daniel Pickrel [sic], leaving a remaining amount of $9,800,000.
 
I believe our clients’ claims have value substantially in excess of
the $12,000,000 offer we previously made during the mediation process. 
The punitive damages alone should exceed that figure, and the actual
damages themselves exceed that figure. Our clients are facing a lot of
extra expense in preparing for the upcoming trial and in presenting their
case during the trial. Therefore, we have reluctantly decided to make
this one final offer in an effort to settle the case.
 
If the insurance carriers you say have the only coverage for these
claims will pay the entire amount of their remaining coverage, which we
understand to be at least $9.8 million, we will settle all our remaining
claims and causes of action against your clients and give a general
release, with court costs to be paid by the defendants.
 
I want to emphasize we are not making this offer because we
think this is sufficient compensation or damages for these claims, but
rather, in an effort to avoid the additional expense and then having to
fight about the coverage. Therefore, if your insurance carriers or clients
wish to accept this offer, they need to do so immediately without delay,
because once we spend additional monies preparing this case for trial,
our position will probably change. Consequently, we ask for an answer
within the next ten (10) days.

          On February 9, 1993, in response to an intervening settlement offer, Prince sent
a demand letter to Alleman, which read as follows:
This letter will confirm that Mr. O’Quinn and I, on behalf of our
twenty-one clients, reject H.R. Management Co.’s settlement offer of
Eight Million, Six Hundred Thousand Dollars ($8,600,000).
 
Our settlement demand is Nine Million, Eight Hundred Thousand
Dollars ($9,800,000.00) as per Mr. O’Quinn’s letter of January 6, 1993. 
This is our final settlement demand and it will not remain open much
longer. Once the Response is filed on the Summary Judgment Motion,
our settlement demand will be withdrawn and our clients have agreed
with Mr. O’Quinn’s decision that the case will be tried.

          That same day, Alleman sent a letter to O’Quinn and Prince, which read as
follows:
This will confirm that we have agreed to settle all claims and
demands by your clients against H. R. Management Company for the
sum of Nine Million, Seven Hundred Fifty[-]Nine Thousand, Five
Hundred Sixty[-]Two Dollars ($9,759,562.00). David and I will prepare
the appropriate releasing documents using the general format we relied
upon in the Daniel Pickrell matter.
 
I would appreciate it if one of you would sign a copy of this letter
and return it to me confirming this agreement at your earliest
convenience.

(Emphasis added.) Prince signed this letter on a signature line beneath the word
“AGREED” and returned it to Alleman. In March 1993, Prince delivered to Alleman
signed and notarized releases from the plaintiffs in exchange for a settlement check
totaling $9,759,562.
          The plaintiffs argue that the February 9, 1993 letter from Alleman to Prince did
not constitute a complete, integrated settlement agreement because it lacked essential
terms and, therefore, the parol evidence rule did not apply to bar extrinsic evidence
of the parties’ intentions and oral representations concerning the terms of the
settlement agreement. However, this Court has previously emphasized that:
[O]ne of the exceptions to the general [parol evidence] rule is that if the
written instrument itself shows to be either ambiguous or incomplete,
parol testimony is admissible to show what the real contract was to the
extent necessary to remove the ambiguity, and to make the contract
complete in its terms which show to be incomplete.

Warren Bros. Co. v. AAA Pipe Cleaning Co., 601 S.W.2d 436, 438 (Tex. Civ.
App.—Houston [1st Dist.] 1980, writ ref’d n.r.e.) (quoting Magnolia Warehouse &
Storage Co. v. Davis & Blackwell, 195 S.W. 184, 185 (Tex. 1917)) (emphasis added). 
In other words, “[w]here a writing is incomplete or ambiguous, parol evidence is
admissible to explain the writing or to assist in the ascertainment of the true
intentions of the parties insofar as the parol evidence does not alter or contradict any
part of the written memorandum in question.” Warren Bros., 601 S.W.2d at 438-39
(emphasis added).
          Here, the February 9, 1993 letter from Alleman to Prince, subsequently signed
and agreed to by Prince, expressly “confirmed” an agreement to settle “all claims and
demands by [the plaintiffs] against [HRM] for the sum of [$9,759,562].” It is true
that the letter did not memorialize a time for performance, the specific names of all
the settling parties, or the payor of the settlement funds. However, the fact that such
terms were missing from the face of the agreement was not fatal and did not render
the agreement ambiguous. Rather, the agreement was merely incomplete, and the
trial court could consider parol evidence for the limited purpose of “mak[ing] the
contract complete in its terms which show to be incomplete.” See id. at 438.
          When no specific time for performance is stated in a contract, the law will
imply a reasonable time. CherCo Props., Inc. v. Law, Snakard & Gambill, P.C., 985
S.W.2d 262, 266 (Tex. App.—Fort Worth 1999, no pet.); see Moore v. Dilworth, 179
S.W.2d 940, 942 (Tex. 1944). In fact, the parties did, and obviously intended to, 
fulfill the settlement agreement within a reasonable time after February 9, 1993. In
regard to Alleman’s proposal, accepted by Prince, to settle “all claims and demands
by your clients,” there can be no reasonable question that the attorneys for both the
plaintiffs and for HRM were aware of the identities of the individual plaintiffs and
the nature of their specific claims. In regard to the question of the identity of the
payor to fund the settlement, it is evident from the summary judgment record that the
parties understood such payors to be either HRM or its “insurance carriers,” as
referenced by O’Quinn in his January 6, 1993 letter.
          The plaintiffs concede in their briefing that, “In the case at bar, all parties agree
that there was a contract. The issue here is what are the terms of the contract . . . .” 
They argue that an oral agreement was reached between their attorneys and the
attorneys for the defendants to settle the plaintiffs’ claims in the underlying lawsuit
for “all available” insurance policy limits covering HRM and that such agreement was
incompletely memorialized by the exchange of correspondence culminating in the
February 9, 1993 letter. The plaintiffs also concede that, in settling their claims, they
“knew they were not receiving any of the $15 million policy,” but they assert that
they “mistakenly believed they were receiving all available insurance when they were
not.”
          However, a lack of clarity in the language chosen by the parties does not
suffice to render an agreement ambiguous. Universal C.I.T. Credit Corp. v. Daniel,
243 S.W.2d 154, 157 (Tex. 1957). Rather, “[o]nly if the intention of the parties as
expressed on the face of the document is doubtful may the court resort to parol
evidence to resolve the doubt.” Massey v. Massey, 807 S.W.2d 391, 405 (Tex.
App.—Houston [1st Dist.] 1991), writ denied, 867 S.W.2d 766 (Tex. 1993). Again,
an ambiguity does not arise simply because the parties advance conflicting
interpretations of their agreement. See Forbau, 876 S.W.2d at 134.
          Here, the February 9, 1993 letter from Alleman, agreed to by Prince, did not
in any way memorialize an agreement to settle the plaintiffs’ claims for the limits of
“all available insurance” policies covering HRM. Rather, we hold that, as a matter
of law, the letter was an agreement to settle the plaintiffs’ claims for a sum certain,
$9,759,562, in exchange for signed releases. The parol evidence on which the
plaintiffs rely would have, therefore, materially “alter[ed] or contradict[ed]” the
express terms of the 1993 settlement agreement. See Warren Bros., 601 S.W.2d at
438-39.
          The plaintiffs also argue that, as an exception to the parol evidence rule,
extrinsic evidence may be used to show the existence of a mistake of fact concerning
the nature of the 1993 settlement agreement. The parol evidence rule does not apply
when it is alleged that, by reason of mutual mistake, “an agreement does not express
the real intention of the parties”; in such cases, extrinsic evidence may be admissible
to show the real agreement. Marcuz v. Marcuz, 857 S.W.2d 623, 627 (Tex.
App.—Houston [1st Dist.] 1993, no writ). When mutual mistake is alleged, the party
seeking relief must show what the parties’ true agreement was and that the instrument
incorrectly reflects that agreement because of a mutual mistake. Id. Texas courts
have held that unilateral mistake by one party, combined with knowledge of that
mistake by the other party, is equivalent to mutual mistake. Davis v. Grammar, 750
S.W.2d 766, 768 (Tex. 1988); Marcuz, 857 S.W.2d at 627.
          Here, the plaintiffs argue that the summary judgment record “conclusively
establishes mutual mistake.” However, the record presented does not show that the
“real intention” of the 1993 settlement agreement was to settle the plaintiffs’ claims
for the limits of all applicable policies covering HRM for which coverage had not
been formally denied. Rather, the agreement was, as we have held, for a sum certain. 
Moreover, the summary judgment record does not support the conclusion that the
agreement was the result of a unilateral mistake, e.g., a mistake on the part of the
plaintiffs as to the terms of the settlement, of which the defendants were aware. The
parties dispute the issue of whether counsel for HRM had ever represented to
O’Quinn or Prince that coverage under the $15 million policy had been formally
“denied” or had simply told O’Quinn and Prince that coverage under this policy was
“not available” for purposes of negotiating any final settlement. Prince and O’Quinn
had copies of all policies covering HRM and could have made their own assessment
of whether coverage under the $15 million Centennial policy was “available.” From
the correspondence exchanged by the parties’ counsel, it is clear that, in either case,
to recover any sum greater than the $10.3 million tendered by the defendants in
settlement, the plaintiffs would have first had to take their claims to trial and to obtain
an excess verdict. Instead, the plaintiffs, on the advice of Prince and O’Quinn, chose
to settle their claims, which O’Quinn acknowledged that they were doing “in an effort
to avoid the additional expense [of preparing for and prosecuting their claims at trial]
and then having to fight about the coverage.”
          Thus, we hold that the trial court did not err in determining that the summary
judgment record did not establish as a matter of law that the 1993 settlement
agreement was the result of a mutual or unilateral mistake. Similarly, we also
conclude that the evidence does not raise a fact question as to whether the parties’
settlement agreement was the result of a mutual or unilateral mistake.
          Because the 1993 settlement agreement was an agreement to settle the
plaintiffs’ claims for a sum certain, $9,759,562, in exchange for signed releases, we
hold that the trial court did not err in determining that the defendants did not breach
the terms of the agreement by delivering settlement funds to the plaintiffs in the
amount of $9,759,562. Accordingly, we further hold that the trial court did not err
in granting summary judgment for the defendants, instead of in favor of the plaintiffs,
on the plaintiffs’ claim that the defendants breached the 1993 settlement agreement.
          We overrule the plaintiffs’ first issue.



Quantum Meruit
          In part of their second issue, the plaintiffs contend that the trial court erred in
granting summary judgment against them on their claim for quantum meruit because
genuine issues of material fact existed as to this claim. Their quantum meruit claim
was raised as an alternative ground of recovery to their breach-of-contract claims. As
the plaintiffs acknowledge, they could recover in quantum meruit only in the absence
of an express contract. See Murray v. Crest Constr., Inc., 900 S.W.2d 342, 345 (Tex.
1995). Here, as we have held above, the material terms of the 1993 settlement
agreement were expressly set forth in the February 9, 1993 letter from Alleman to
Prince. Therefore, we hold that the trial court did not err in granting summary
judgment against the plaintiffs on their quantum meruit claim.
          We overrule that portion of the plaintiffs’ second issue concerning their
quantum meruit claim.
 
Fraud, Misrepresentation, Estoppel 
          In their second issue, the plaintiffs also contend that the trial court erred in
rendering summary judgment against them on their claims for fraudulent inducement,
negligent misrepresentation, and promissory estoppel because genuine issues of
material fact existed as to these claims and because the “disclaimer of reliance”
provision of the releases signed by the plaintiffs does not preclude these claims.



          One of the grounds asserted in the defendants’ summary judgment motion as
to these claims was that the plaintiffs disclaimed reliance on any allegedly fraudulent
representations made by the defendants by signing releases that contained a
“disclaimer of reliance” provision.
          The plaintiffs’ fraudulent-inducement claims are, in essence, based on their
contention that they would never have entered into the 1993 settlement agreement had
they known that coverage under the $15 million policy had not been formally
“denied” and that, to the extent that the defendants represented that coverage under
this policy had been “denied,” such representations constituted fraud.
          Texas law has long imposed a duty not to induce another to enter into a
contract through the use of fraudulent misrepresentations. Formosa Plastics Corp.
USA v. Presidio Eng’rs & Contractors, Inc., 960 S.W.2d 41, 46 (Tex. 1998). This
legal duty is separate and independent from the duties established by the contract
itself; a party is not bound by a contract procured by fraud. Id.
          A cause of action for fraud requires proof of “a material misrepresentation,
which was false, and which was either known to be false when made or was asserted
without knowledge of its truth, which was intended to be acted upon, which was
relied upon, and which caused injury.” Id. at 47 (quoting Sears, Roebuck & Co. v.
Meadows, 877 S.W.2d 281, 282 (Tex. 1994)) (emphasis added). Claims for negligent
misrepresentation and promissory estoppel also require proof of reliance as an
essential element. Thompson v. Deloitte & Touche, L.L.P., 902 S.W.2d 13, 19 (Tex.
App.—Houston [1st Dist.] 1995, no writ) (“The elements of negligent
misrepresentation include a false representation made for the guidance of others who
rely on it and suffer damage.”); Leach v. Conoco, Inc., 892 S.W.2d 954, 959 n.2 (Tex.
App.—Houston [1st Dist.] 1995, writ dism’d w.o.j.) (“The elements of promissory
estoppel are as follows: (1) a promise; (2) foreseeability of reliance on the promise
by the promisor; and (3) substantial detrimental reliance by the promisee.”).
          To defeat the summary judgment motion on their fraud claims, the plaintiffs
had to present evidence sufficient to raise a fact question as to whether the defendants
made material misrepresentations with the intent to induce the plaintiffs into settling
their claims. Here, the plaintiffs argue that the summary judgment evidence raised
a fact question as to whether the defendants materially misrepresented the amount of
insurance coverage available to fund any settlement of the plaintiffs’ claims. The
plaintiffs contend that the defendants’ representation that coverage under the $15
million Centennial policy had been denied was known, or should have been known,
by the defendants to be false at the time that it was made, was intended to be and was
relied upon by the plaintiffs, and caused the plaintiffs to be wrongly induced into
settling their claims.
          Effect of the Disclaimer of Reliance
          In support of their argument that the plaintiffs disclaimed reliance on any
allegedly fraudulent representations, the defendants rely chiefly on Schlumberger
Technology Corporation v. Swanson, 959 S.W.2d 171, 179-81 (Tex. 1997). The
Schlumberger court articulated its concern that parties should, under certain
circumstances, be able effectively to bring an end to a dispute by executing releases
disclaiming reliance as follows:
Parties should be able to bargain for and execute a release barring all
further dispute. This principle necessarily contemplates that parties may
disclaim reliance on representations. And such a disclaimer, where the
parties’ intent is clear and specific, should be effective to negate a
fraudulent inducement claim. As an example, a disclaimer of reliance
may conclusively negate the element of reliance, which is essential to a
fraudulent inducement claim. . . . The question is under which
circumstances such disclaimers are binding.

Id. at 179 (citations omitted).
          In Schlumberger, the parties negotiated a buy-out of the Swansons’ interest in
a sea-diamond mining project. Id. at 174. According to the Swansons, during their
negotiations, Schlumberger represented to them that the project was neither
technologically feasible nor commercially viable, refused to give them any
information or data supporting these representations, and disputed the validity of the
Swansons’ rights and interests in the project. Id. As part of the negotiated buy-out,
the Swansons released Schlumberger from all causes of action, known or unknown,
and specifically agreed that they were not relying on any statements or representations
of Schlumberger, were relying on their own judgment, and had been represented by
counsel, who had explained the entire contents and legal consequences of the release. 
Id. After Schlumberger subsequently sold its interest in the sea-diamond mining
project for a profit, the Swansons sued Schlumberger for fraudulently inducing them
to sell their interest at an undervalued price. Id. A jury found in favor of the
Swansons on all issues, but the trial court rendered a judgment notwithstanding the
verdict. Id. at 174-75. On appeal, the court of appeals reversed and rendered
judgment in accordance with the jury’s findings.



          In reversing the court of appeals and reaching its holding that the language of
the release signed by the Swansons precluded all of their claims as a matter of law,
the Texas Supreme Court considered it significant that the parties (1) were
represented by “highly competent and able legal counsel,” (2) negotiated with each
other at arm’s length, (3) were “knowledgeable and sophisticated business players,”
(4) disagreed over the value of the mining project, and (5) entered into the release to
end their dispute about the value of the project. Id. at 180. In characterizing its
holding, the court noted as follows:
In sum, we hold that a release that clearly expresses the parties’ intent
to waive fraudulent inducement claims, or one that disclaims reliance
on representations about specific matters in dispute, can preclude a
claim of fraudulent inducement. We emphasize that a disclaimer of
reliance or merger clause will not always bar a fraudulent inducement
claim.

Id. at 181 (emphasis added). Therefore, in assessing the effect of the disclaimers at
issue in this case, we must analyze not only the language used, but also the particular
circumstances under which the disclaimers were executed. Id. at 179 (“The contract
and the circumstances surrounding its formation determine whether the disclaimer of
reliance is binding.”).
          Here, the individual plaintiffs each signed a release and indemnity agreement
releasing HRM and Atlantic Lloyds from all existing and future claims. The releases
each contained the following disclaimer:
I expressly warrant and represent to the parties hereby released
and to each of them as a part of the consideration for the payment of the
above-mentioned sum of money that before executing this instrument,
I have fully informed myself of its terms, contents, conditions, and
effect; that in making this settlement I have had the benefit of the advice
of doctors and attorneys of my own choosing; and no promise or
representation of any kind has been made to me by the parties hereby
released or by anyone acting for them, except as is expressly stated in
this instrument. I have relied solely and completely upon my own
judgment, and the advice of my counsel in making this settlement; and
I fully understand that this is a full, complete, and final release, and that
the sum of money mentioned above is all the money that is to be paid to
me by [HRM] as a result of the herein-described accident.

(Emphasis added.) Each release also bore a signature line, signed by Prince,
acknowledging that he had “fully and completely” explained the terms of the release
to each plaintiff before the release was signed.
          The language of the disclaimer signed by the plaintiffs in this case tracks the
language of the disclaimer held to be effective by the Supreme Court in Schlumberger
and similarly expresses the parties’ intent unequivocally to disclaim reliance upon
representations by the defendants.


 Additionally, although there is no evidence that
the individual plaintiffs were themselves “knowledgeable and sophisticated”
concerning the issues raised in the underlying litigation, there is no dispute that the
plaintiffs were represented by “highly competent and able legal counsel” who
negotiated at arm’s length with counsel for HRM.
          The plaintiffs argue that the present case is distinguishable from Schlumberger
because, in that case, the Swansons sued over alleged misrepresentations concerning
the value of the mining project, which had been one of the subjects of the parties’
dispute and a central reason for the negotiated buy-out. The plaintiffs argue that, in
contrast, the defendants’ alleged misrepresentations as to the amount of available
coverage are not covered by the disclaimer in this case because such
misrepresentations were not a subject of the parties’ dispute. The plaintiffs assert that
“the ‘matter in dispute’ in the underlying lawsuit concerned chlordane poisoning and
damages, not insurance coverage.”
          We disagree. The record presented here demonstrates that “the specific matters
in dispute” in the underlying litigation included the issues of whether HRM’s
coverage under the $15 million Centennial policy applied to any of the plaintiffs’
claims and whether such coverage would form any part of a negotiated settlement of
the plaintiffs’ claims. The testimony and correspondence contained in the summary
judgment record indicate that a sharp disagreement existed between counsel for the
plaintiffs and counsel for HRM on these issues. Additionally, O’Quinn testified that,
in his opinion, HRM possessed sufficient assets to satisfy a judgment in excess of the
limits of its insurance policies. Moreover, as noted above, O’Quinn’s January 6, 1993
letter conveyed that the plaintiffs’ $9.8 million settlement demand was made in an
effort to avoid the expense of a trial and “having to fight about the coverage.” Here,
as in Schlumberger, it is evident that the parties in the underlying litigation entered
into a settlement agreement to resolve, in part, their disagreement about the issue of
available coverage.
          The plaintiffs also argue that the present case is controlled by this Court’s
opinion in Decker v. Urrutia, 965 S.W.2d 26 (Tex. App.—Houston [1st Dist.] 1998),
rev’d, 992 S.W.2d 440 (Tex. 1999). In Decker, which involved an automobile
accident, this Court reversed a summary judgment granted by the trial court in favor
of a driver of a rental truck and the truck rental company. Id. at 27. In doing so, we
concluded that, because certain insurance provisions contained in the rental
agreement were not written on forms prepared by the State Board of Insurance, such
provisions were void, were not incorporated into the insurance policy, and did not
serve to limit the amount of insurance available to pay the accident victim’s claim. 
Id. at 28-29. We held, therefore, that the summary judgment evidence presented was
sufficient to raise a fact question regarding the plaintiff’s affirmative defense of
mutual mistake, and we remanded the case to the trial court. Id. at 29.



          The plaintiffs rely on our opinion on rehearing in Decker, in which we denied
the motions for rehearing filed in that case. Id. at 30. In our opinion on rehearing,
we distinguished Schlumberger and noted that a disclaimer signed by the parties in
Decker did not bar recovery because there was no dispute between the parties as to
the amount of available insurance coverage. Id. at 30.


 Because the record here
established that one of the matters in dispute between the parties was the availability
of coverage under the $15 million Centennial policy, we find Decker distinguishable
for the same reasons that we find the court’s reasoning in Schlumberger applicable.
          We hold that, based on this record, the disclaimer contained in the releases
signed by the plaintiffs conclusively negated the element of reliance on any
representations concerning the availability of coverage under HRM’s $15 million
Centennial policy to fund a settlement of the underlying litigation.


 Accordingly, we
further hold that the trial court did not err in granting summary judgment for HRM
and Atlantic Lloyds on the plaintiffs’ claims for fraudulent inducement, negligent
misrepresentation, and promissory estoppel.
          Scope of the Disclaimer of Reliance
          The plaintiffs also contend that, because the releases signed in this case do not
specifically mention defendants Atlantic Mutual, Centennial, Brady, or Gervasio,
these defendants cannot claim any benefit from the releases’ disclaimer of reliance.
          Under Texas law, the mere naming of a “general class of tortfeasors” in a
release does not discharge the liability of each member of that class. Duncan v.
Cessna Aircraft Co., 665 S.W.2d 418, 419-20 (Tex. 1984). “A tortfeasor can claim
the protection of a release only if the release refers to him by name or with such
descriptive particularity that his identity or his connection with the tortious event is
not in doubt.” Id. at 420. In Duncan, the court held ineffective a release that
purported to discharge claims against not only a named airplane owner and its
employees, but also against “any other corporations or persons whomsoever
responsible therefor, whether named herein or not . . . .” Id. at 418.
          The plaintiffs argue that the provisions of the release, including the disclaimer
of reliance, apply only to those parties particularly described in the release, namely,
“[HRM], all its affiliated companies, parent companies, subsidiaries, officers, agents,
and employees, its insurer [Atlantic Lloyds], and all its affiliated companies, officers,
agents, and employees.”
          We must presume that parties to a contract intend every contractual provision
to have some meaning. Schlumberger, 959 S.W.2d at 180; CBI Indus., 907 S.W.2d
at 520. Therefore, in determining the proper scope of the disclaimer, we look first to
the language of the disclaimer itself, which recites that “no promise or representation
of any kind has been made to me by the parties hereby released or by anyone acting
for them.” (Emphasis added.) Unlike the release held ineffective in Duncan, the
disclaimer of reliance at issue here did not attempt to include a virtually limitless
“general class of potential tortfeasors.” 665 S.W.2d at 419. Rather, by its plain
language, the disclaimer applies to HRM, Atlantic Lloyds, and those specific parties
who had the authority to act on behalf of HRM or Atlantic Lloyds in connection with
the underlying lawsuit.
          Generally, an insurer has a contractual obligation to act on behalf of its insured
to retain counsel and to participate in the defense, and possibly settlement, of a
lawsuit against its insured if the petition states a claim within the policy coverage. 
See Nat’l Union Fire Ins. v. Merchant’s Fast Motor Lines Inc., 939 S.W.2d 139, 141
(Tex. 1997). As noted above, it is undisputed that two of HRM’s insurance policies
were issued by Centennial, which was itself owned by Atlantic Mutual. It is also
undisputed that, at all relevant times, Brady and Gervasio were employed by Atlantic
Mutual. Brady was a claims handler assigned to the underlying litigation, and
Gervasio was Brady’s supervisor. Here, the plaintiffs direct us to no evidence in the
record that, at any relevant time, Centennial, as HRM’s insurer, Atlantic Mutual, as
Centennial’s parent company, and Brady and Gervasio, as employees of Atlantic
Mutual with the actual responsibility of handling the plaintiffs’ claims, were not
acting on behalf of HRM in conformance with this contractual duty.
          Based on the record presented, we hold that, by limiting its application to the
specific parties who could and did act on behalf of HRM and Atlantic Lloyds in the
underlying lawsuit, the disclaimer of reliance was not so broad as simply to name a
“general class of tortfeasors” and described Centennial, Atlantic Mutual, Brady, and
Gervasio with sufficient particularity as to include those defendants within the scope
of the disclaimer. Accordingly, we further hold that the trial court did not err in
granting summary judgment for these defendants on the plaintiffs’ claims for
fraudulent inducement, negligent misrepresentation, and promissory estoppel.
          We overrule the portion of plaintiffs’ second issue concerning their claims for
fraud, negligent misrepresentation, and promissory estoppel.



Insurance Code Claims
          In their third issue, the plaintiffs contend that the trial court erred in granting
summary judgment for the defendants on the plaintiffs’ claims for breach of insurance
contract, breach of the duty of good faith and fair dealing, and violations of article
21.21 of the Texas Insurance Code.


 The plaintiffs argue that
[o]nce the insurance companies consented to the settlement, [the
plaintiffs] became third-party beneficiaries, and the insurance companies
owed a direct contractual duty to deal in good faith with them. 
Accordingly, by failing to pay all the insurance they had promised to
pay, they breached their duty of good faith and fair dealing as well as
Article 21.21 of the Texas Insurance Code.

The defendants sought summary judgment on these claims on the grounds that the
plaintiffs, as third-party claimants, lacked standing to assert such claims against
HRM’s insurers.
          Article 21.21 prohibits an insurer from engaging in “unfair settlement
practices” with respect to a claim by “an insured or beneficiary.” Tex. Rev. Civ.
Stat. Ann. art. 21.21, § 4(10)(a) (Vernon Supp. 2004). Such unfair settlement
practices include misrepresenting a material fact or policy provision relating to
coverage at issue. Id. § 4(10)(a)(1) (Vernon Supp. 2004). However, article 21.21
expressly provides that claims based on unfair settlement practices are unavailable
to third-party claimants such as the plaintiffs. Id. § 4(10)(b) (Vernon Supp. 2004)
(“[T]his clause does not provide a cause of action to a third party asserting one or
more claims against an insured covered under a liability insurance policy.”); see also
Crown Life Ins. Co. v. Casteel, 22 S.W.3d 378, 384 n.1 (Tex. 2000) (noting that “the
amended clause did not create a direct cause of action against an insurance carrier by
third parties whose claims were based on the liability of the insureds.”). As noted by
the Texas Supreme Court,
A third party claimant has no contract with the insurer or the insured,
has not paid any premiums, has no legal relationship to the insurer or
special relationship of trust with the insurer, and in short, has no basis
upon which to expect or demand the benefit of the extra-contractual
obligations imposed on insurers under [article] 21.21 with regard to their
insureds.

Allstate Ins. Co. v. Watson, 876 S.W.2d 145, 149 (Tex. 1994).
          Here, it is undisputed that the plaintiffs did not purchase an insurance policy
from HRM’s insurers and that the plaintiffs were third-party claimants who asserted
claims against HRM covered by its insurance policy. Accordingly, we hold that the
plaintiffs have no standing to assert claims for breach of an insurance contract, breach
of the duty of good faith and fair dealing, or violations of article 21.21 based on any
conduct of HRM’s insurers prior to the settlement agreement. Thus, we further hold
that the trial court did not err in granting summary judgment in favor of the
defendants on these claims.
          As noted above, the plaintiffs also argue that, after the settlement was reached
in the underlying lawsuit, they became third-party beneficiaries of HRM’s insurance
policies and assumed standing to bring suit for alleged violations of the contractual
and extra-contractual obligations owed by HRM’s insurers.
          The plaintiffs argue that, under this Court’s decision in Hermann Hospital v.
National Standard Insurance Company, they had standing to present claims for
breach of the duty of good faith and fair dealing, breach of an insurance contract, and
violations of article 21.21. Id., 776 S.W.2d 249, 252 (Tex. App.—Houston [1st Dist.]
1989, writ denied). In contrast to this case, in Hermann Hospital, a hospital sued a
patient’s insurance carrier over representations of coverage allegedly made by the
insurer, upon which representations the hospital relied in admitting and treating the
patient. Id. at 252. However, as this Court noted, that case involved a direct
relationship between the parties that is not presented here:
We find that as a practical matter, the relationship between insurance
companies and providers of health care is a direct one, with the health
care provider acting in reliance on the representations of coverage made
by the carriers. Hospitals and other health care providers must, and do,
rely upon the insurance carriers representations of coverage in making
their decisions regarding admission of potential patients. If insurance
coverage and benefits can be verified, the hospital will usually accept an
assignment of benefits to insure it is paid for any services rendered. If
insurance coverage and benefits cannot be verified, or if no coverage
exists, the medical provider can then make alternative financial
arrangements.

Id. (emphasis added). We conclude that Hermann Hospital is substantively
distinguishable.
          The plaintiffs also rely on Getty Oil Company v. Insurance Company of North
America, for the proposition that “claimants become third party beneficiaries of
insurance once there is a judgment or settlement approved by the carriers.” Id., 845
S.W.2d 794 (Tex. 1992). In Getty, the court addressed a situation in which a specific
insurance policy provision prohibited third-party claims against the insured or the
insurer until the insured’s liability was determined by a final judgment or agreement. 
Id. at 801. The court noted, “We have held that when such . . . policy provisions
exist, ‘a third party’s right of action against the insurer does not arise until he has
secured such an agreement or a judgment against the insured.’” Id. (quoting Great
Am. Ins. Co. v. Murray, 437 S.W.2d 264, 265-66 (Tex. 1969)). The plaintiffs direct
us to no such specific contractual provisions in the present case. Additionally, the
third-party claimant in Getty asserted contractual rights to be indemnified by the
insured and to be named as an additional insured on the applicable policies. The
plaintiffs do not assert such contractual rights in this case.
          The Texas Supreme Court has held that, in the context of a first-party lawsuit
by an insured against its insurer based on an agreed judgment, the insurer’s
contractual duty of good faith and fair dealing toward its insured does not extend
beyond the signing of the agreed judgment. Mid-Century Ins. Co. of Tex. v. Boyte,
80 S.W.3d 546, 548-49 (Tex. 2002); Stewart Title Guar. Co. v. Aiello, 941 S.W.2d
68, 71 (Tex. 1997). Consequently, any claims that the insured may have against the
insurer based on the agreed judgment sound in contract, not in tort. Aiello, 941
S.W.2d at 71. We find these cases analogous to the situation presented here, in which
the plaintiffs argue that they assumed the status of third-party beneficiaries of HRM’s
insurance policies after the signing of the 1993 settlement agreement. Therefore,
assuming that the plaintiffs attained the status of third-party beneficiaries of HRM’s
insurance policies after the agreement was reached, we hold that HRM’s insurers
owed the plaintiffs no extra-contractual duty of good faith and fair dealing thereafter;
thus, any claims that the plaintiffs have regarding the alleged conduct of HRM’s
insurers following that settlement sound in contract, not in tort.
          We hold that the trial court did not err in granting summary judgment in favor
of the defendants on the plaintiffs’ claims for breach of an insurance contract, breach
of the duty of good faith and fair dealing, and violations of article 21.21 based on the
alleged conduct of HRM’s insurers subsequent to the parties’ settlement agreement.
          We overrule the plaintiffs’ third issue.



“Abandoned” Motions
          In their fifth issue, the plaintiffs contend that, to the extent that the trial court’s
July 11, 2001 global, final, amended summary judgment granted any unheard pending
motions for summary judgment filed by the defendants, or motions that were denied
by the appointed master and not appealed to the trial court, such ruling was in error. 
Having held that the trial court, based on the grounds asserted in the defendants’
motions presented and argued to it, did not err in granting summary judgment on all
of the plaintiffs’ claims,


 we need not address the merits of any of the grounds
asserted in other, so-called “abandoned” motions.



           The Defendants’ Appeal
Fraud, Conspiracy to Defraud, and Unjust Enrichment            
          In their first issue, Atlantic Lloyds and Centennial contend that the trial court
erred in granting summary judgment against them on their counterclaims against the
plaintiffs and Prince for fraud, conspiracy to defraud, and unjust enrichment. Within
these issues, Atlantic Lloyds and Centennial argue that the summary judgment
evidence “more than demonstrates a fact issue as to fraudulent misrepresentation” and
that the plaintiffs “did not conclusively negate Atlantic Lloyds’ and Centennial’s 
reliance on the fraudulent misrepresentations.”
          Fraud and Conspiracy to Defraud
          The plaintiffs and Prince, in their summary judgment motions on the
defendants’ counterclaims, argued, in part, that the defendants did not present
summary judgment evidence sufficient to raise a fact issue on each element of the
defendants’ cause of action for fraud. As noted above, to prevail on a cause of action
for fraud, a party must offer proof of “a material misrepresentation, which was false,
and which was either known to be false when made or was asserted without
knowledge of its truth, which was intended to be acted upon, which was relied upon,
and which caused injury.” Formosa Plastics, 960 S.W.2d at 47 (quoting Meadows,
877 S.W.2d at 282). In their response, the defendants presented voluminous
deposition testimony, documents, and expert reports as direct and circumstantial
evidence to refute the plaintiff’s arguments and to raise a material fact question.
          In order to demonstrate the falsity of the plaintiffs’ allegations of wide-spread
spraying of chlordane at the apartment complex, the defendants produced the 
following: (1) the deposition testimony of Annette Lorback, a resident of the
apartment complex, who never saw any of the plaintiffs, her friends, or members of
her own family who lived at the complex exhibit any signs of illness; (2) the
deposition testimony of Toni Armeli, a former manager of the apartment complex,
that none of the residents complained of sickness to her; (3) the deposition testimony
of Lonnie Jackson, a handyman who assisted Stafford, that only two vacant
apartments and three or four other apartments were sprayed with chlordane and were
then cleaned; (4) an analysis of the original deposition testimony given by Stafford
and Isaac Pineda, another handyman at the complex, that indicated that the apartments
of 14 of the 22 plaintiffs were probably not sprayed; (5) the deposition testimony of
many of the plaintiffs, who did not know whether their apartments had been sprayed
with chlordane; (6) the results of testing at the apartment complex, conducted by the
City of Houston, that measured the highest level of airborne chlordane, which was
approximately 1/16th of the permitted OSHA exposure level, in a vacant apartment;
(7) the testimony of (a) TDA investigator Eujean Hinze that the levels of chlordane
measured at the apartments were below the approved levels of exposure and (b)
Stafford, who, when questioned in connection with the investigation of the spraying,
could not verify which apartments were sprayed with chlordane and did not remember
whether he used chlordane or another pesticide; and (8) the conclusions and opinions
of John Yocum, a professional engineer and environmental consultant retained as an
expert witness by the defendants, that concentrations of chlordane were higher in
unoccupied apartments than in occupied ones.
          With regard to the plaintiffs’ allegations of medical injuries and damages
resulting from chlordane exposure, the defendants asserted that such evidence was
misleading, incomplete, or manufactured. The defendants argued that the summary
judgment evidence demonstrated that (1) none of the plaintiffs’ treating or examining
physicians performed a differential diagnosis on any of the plaintiffs to rule out other
potential causes of their alleged conditions and symptoms; (2) the plaintiffs’ treating
physicians took inadequate medical histories and failed to note or to take into
consideration the fact that several of the plaintiffs had significant, documented, pre-existing health factors, including alcoholism, anxiety disorders, cancers, diabetes,
drug abuse, exposure to other pesticides, heart attacks, hypertension, obesity,
psychiatric problems, physical or mental abuse, sexually transmitted diseases, sleep
disorders, long-term smoking, and surgeries; (3) the plaintiffs’ physicians relied only
on literature provided to them by Prince in forming their conclusions that the
plaintiffs’ conditions and symptoms were caused by exposure to chlordane; (4) many
of the plaintiffs did not undergo toxicological testing, such as a fat biopsy, to detect
the levels of their alleged chlordane exposure; (5) those plaintiffs who were tested did
not show the presence of unsafe levels of chlordane and showed exposure to other
chemicals; and (6) an alleged “close personal relationship” existed between Dr.
Howard Siegler, one of the plaintiffs’ treating physicians, and O’Quinn.
          The defendants also presented the opinions of their own medical experts. Dr.
John Meyer, a board-certified neurologist, testified that he reviewed the plaintiffs’
medical records and the relevant medical articles and literature and formed the
opinion that none of the plaintiffs had objective neurological or psychiatric signs
attributable to chlordane exposure. Dr. Wayne Snodgrass, a board-certified
toxicologist and pharmacologist, testified that the levels of chemicals detected in the
blood and fat tissue samples taken from Stafford and Melvin Thornton, another
plaintiff, were more consistent with acute, recent chlordane exposure (e.g., within a
few hours before the blood test) than with high levels of exposure over a long term.
          Additionally, the defendants presented the opinions and report prepared by
Barry Zalma, a certified fraud examiner retained as an expert witness by the
defendants. In his report, Zalma concluded that, in his opinion, there were more than
50 separate indicators that the plaintiffs’ underlying claims were fraudulent,
including: (1) the plaintiffs’ injury claims were subjective and persisted contrary to
medical studies; (2) the plaintiffs gave false or incomplete medical histories to their
doctors; (3) the plaintiffs’ treating physicians prepared and submitted identical
medical reports for each plaintiff, despite differences in exposure, symptoms, medical
history, and physical condition among the plaintiffs; (4) the plaintiffs failed to
mention their alleged chlordane exposure to any doctor other than one hired by their
attorneys; (5) the plaintiffs did not seek any medical attention until after they had
signed a power of attorney; (6) after the 1993 settlement, the plaintiffs did not use the
settlement proceeds for medical monitoring; (7) reports existed from non-treating
doctors who could find no link between the alleged exposure and the plaintiffs’
alleged conditions and symptoms; (8) the plaintiffs’ claim of widespread spraying
was physically impossible, based on the fact that a single, half-gallon bottle of
chlordane was purchased and could not have been sufficient to spray 20 or more
apartments, as alleged; (9) when the bottle was seized by the TDA in its investigation,
eight ounces of chlordane remained unused; and (10) indoor spraying of other
pesticides at the apartment complex, as shown on work orders from an exterminating
company, had occurred.
          The plaintiffs and Price argue that the defendants failed to put forth any
evidence in response to the plaintiffs’ summary judgment motions that the defendants
acted in reliance upon the alleged misrepresentations. It is well-settled that a party
asserting a cause of action for fraud must prove that it “actually and justifiably relied”
on the alleged misrepresentation and thereby suffered injury. Ernst & Young, L.L.P.
v. Pac. Mut. Life Ins. Co., 51 S.W.3d 573, 577 (Tex. 2001) (emphasis added); see Am.
Tobacco Co., Inc. v. Grinnell, 951 S.W.2d 420, 436 (Tex. 1997) (noting that allegedly
defrauded party must show that it “reasonably” relied on misrepresentations). As the
Restatement (Second) of Torts sets forth:
One who makes a fraudulent misrepresentation is subject to liability to
the persons . . . whom he intends or has reason to expect to act or to
refrain from action in reliance upon the misrepresentation, for pecuniary
loss suffered by them through their justifiable reliance in the type of
transaction in which he intends or has reason to expect their conduct to
be influenced.

Restatement (Second) of Torts § 531 (1977) (emphasis added); see Tex. Capital
Sec., Inc. v. Sandefer, 58 S.W.3d 760, 772-73 (Tex. App.—Houston [1st Dist.] 2001,
pet. denied). In other words, in the context of two opposing parties engaged in
litigation and negotiating at arm’s length and from equal bargaining positions, one
party cannot prevail in a subsequent action for fraud based on its “reliance” on its
opponent’s obvious lie or on a misrepresentation that, with reasonable diligence,
could have easily been refuted. Such reliance is not justifiable or reasonable.
          As evidence of their reliance on the truth of the claims raised by the plaintiffs
in the underlying lawsuit, the defendants point to the fact that they ultimately agreed
to settle the plaintiffs’ claims for $10.3 million. However, the summary judgment
evidence does not support the defendants’ assertion that their reliance on the
plaintiffs’ claims in the underlying suit was justifiable or reasonable. Much of the
summary judgment evidence on which the defendants relied as indicative of fraud
was available through discovery in the underlying lawsuit. In his report summarizing
his analysis of the underlying litigation, Zalma, the defendants’ retained fraud
examiner, concluded as follows:
Shortly before the settlement the Defendants’ case was improving.
[Additional doctors’] reports were in, Plaintiffs’ [sic] could not produce
objective evidence of injury and were concerned that taken individually
the damages awarded would be small. Prince brought in O’Quinn to
trade on his fame and skill. O’Quinn did nothing but lend his name and
negotiating skill to the suit. That fame caused [HRM] to raise its offers
more than two-fold. Fraud indicators that should have been obvious to
the defense team were clouded by the desire to resolve the case before
O’Quinn’s reputation caused more damage to the defendants than could
be reasonably anticipated.

(Emphasis added.)
          The defendants also argue that, because of Stafford’s and Prince’s deception,
they could not have uncovered the allegedly fraudulent nature of the plaintiffs’
underlying claims until several years after the 1993 settlement agreement. However,
this argument is refuted by much of the defendants’ own summary judgment
evidence, including critical analyses of the plaintiffs’ medical records, their treating
physicians’ reports, their depositions, and the testing conducted at the apartment
complex. Moreover, the material allegations contained in Stafford’s 1995 sworn
statement—that spraying was limited and not widespread and that plaintiffs with little
or no exposure to chlordane and few or no injuries had asserted claims in the
underlying lawsuit—were available to HRM through discovery in the underlying
lawsuit, as shown by the defendants’ summary judgment evidence. The defendants
have not shown how they were prevented from uncovering the true nature of these
allegations through discovery in the underlying suit.
          Additionally, several factors other than reliance on the truth of an opponent’s
allegations may influence a party’s decision ultimately to settle disputed claims in a
lawsuit, including the nature of the liability facts, the nature of the damages alleged,
the number of parties involved, the perceived propensity of a jury in the forum to
return a significant damage award, the level of skill of opposing counsel, the quality
of the appearance of the fact witnesses and parties, and the costs associated with
continued discovery, trial preparation, and trial itself. Furthermore, settlement
agreements typically do not admit wrongdoing on the part of the alleged tortfeasor.
          Based on the record presented, we hold that the summary judgment evidence
did not raise a material fact question as to whether the defendants justifiably or
reasonably relied upon any alleged misrepresentation made by the plaintiffs in the
underlying lawsuit. Accordingly, we hold that the trial court did not err in granting
summary judgment in favor of the plaintiffs and Prince on the defendants’
counterclaims for fraud and conspiracy to commit fraud.



 
          Unjust Enrichment
          The defendants further contend that the trial court erred in granting summary
judgment on their equitable counterclaim of unjust enrichment against the plaintiffs
and Prince because the evidence indicated that the proceeds of the 1993 settlement
agreement were obtained “as a result of their scheme to commit insurance fraud.” 
The defendants note that “[a]n action for unjust enrichment is based upon the
equitable principle that a person receiving benefits which were unjust for him to
retain ought to make restitution.” Bramson v. Standard Hardware, Inc., 874 S.W.2d
919, 927 (Tex. App.—Fort Worth 1994, writ denied).
          However, “[g]enerally speaking, when a valid, express contract covers the
subject matter of the parties’ dispute, there can be no recovery under a quasi-contract
theory.” Fortune Prod. Co. v. Conoco, Inc., 52 S.W.3d 671, 684 (Tex. 2000). “When
a valid agreement already addresses the matter, recovery under an equitable theory
is generally inconsistent with the express agreement.” Id. This Court has also
previously held that “unjust enrichment claims are predicated on the absence of an
express contract controlling the circumstances.” Inglish v. Prudential Ins. Co., 928
S.W.2d 702, 706 (Tex. App.—Houston [1st Dist.] 1996, writ denied).
          Here, we have held that the defendants did not present sufficient summary
judgment evidence to raise a material fact question concerning whether they were
fraudulently induced into the 1993 settlement agreement. Therefore, a “valid, express
contract” (the 1993 settlement agreement) existed “which cover[ed] the subject matter
of the parties’ dispute” (the value of the plaintiffs’ claims), and the defendants’ claim 
for unjust enrichment is precluded. Accordingly, based on the record presented, we
hold that the trial court did not err in granting summary judgment in favor of the
plaintiffs and Prince on the defendants’ counterclaims for unjust enrichment.
          We overrule Atlantic Lloyds’s and Centennial’s first issue.
“Judicial Estoppel” and “The Law of the Case”
          In their second issue, the defendants argue that the trial court erred in granting
summary judgment for the plaintiffs on the grounds that the defendants’
counterclaims were barred under the theories of “judicial estoppel” and “law of the
case.” Specifically, the defendants challenge the plaintiffs’ assertions, made in the
plaintiffs’ summary judgment motions, that (1) the defendants were estopped by a
previous interrogatory answer from arguing that any proceeds from a Centennial
insurance policy were used to fund the 1993 settlement agreement and (2) in the event
that this lawsuit might be remanded to the trial court, the defendants could not re-litigate the issue of causation. However, because our holdings on the other issues
raised in this case dispose of the defendants’ appeal, we need not address this issue. 
          Conclusion
          We affirm the judgment of the trial court.
 
 
                                                                        Terry Jennings
                                                                        Justice

Panel consists of Justices Hedges, Jennings, and Alcala.